UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NICK PENCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13CV871 CDP |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs seek a preliminary injunction against enforcement of the City of

St. Louis's ordinances that require street performers to obtain a permit and pay a

fee before performing in public spaces.  I conclude that plaintiffs are likely to

succeed on the merits of their First Amendment claim that the ordinances grant

excessive discretion to the administrator in choosing whether to issue a permit and

the permit scheme is not narrowly tailored to the government's interest in

maintaining peace and order.  As the other preliminary injunction factors are

presumed when a likelihood of success on a First Amendment claim is shown, I

will issue a preliminary injunction.  I will also refer this case to mediation and will

set the case for a prompt trial if it is not resolved in mediation.

## BACKGROUND

Plaintiffs are musicians who wish to play in public spaces in St. Louis, Missouri.  Plaintiffs seek a preliminary injunction to preclude the enforcement of certain ordinances that the City of St. Louis has passed,[1] which ban any person from performing in a public area without having first obtained a permit.  "Perform" is defined to include such activities as "acting, singing, pantomime, juggling, magic, dancing and playing musical instruments, radios or other machines or devices for the producing or reproducing of sound."  City of St. Louis, Mo., Rev. Code § 20.55.010 (2012).  "Public area" is defined to include any public sidewalk, alley, parkway, playground, public right-of-way or easement located in a nonresidential dwelling district within the City of St. Louis.  *Id.*

The following portions of the city are excluded from the definition of public area: the 8th, 11th, 20th, 24th, and 27th Wards, Metrolink platforms and stations, and "any area in which performing is prohibited or otherwise regulated by law." *Id.*  Section 20.56.017 provides an independent ban on performances in public streets, alleys, and the public areas bounding streets and alleys in the 8th, 10th, 20th, 23rd, and 27th Wards, except when a parade or festival permit has been

---

[1] The parties dispute the terminology and proper citations of the City's laws.  I will refer to the City's laws as "ordinances" and shall cite them by their section number as listed in the Revised Code of the City of St. Louis.

issued, and only then with permission from the parade or festival permit holder.

§ 20.56.017 (2010). [2]

## DISCUSSION

"[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011), *vacated on reh'g*, 705 F.3d 845 (8th Cir. 2012)).

A.     Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits of their facial challenge, in that the permitting scheme 1) affords too much discretion to

---

[2] The parties dispute whether Section 20.56.017 is included in the complaint. Count II of plaintiffs' complaint requests that I enter preliminary and permanent injunctions prohibiting the City from enforcing location restrictions set forth in Chapter 20.55 of the Revised Code of the City of St. Louis, as well as in related policies and customs. Section 20.56.017 places restrictions on the locations in which street performers may perform. I find that this complaint is broad enough to place the City on notice that plaintiffs were also challenging Section 20.56.017.

government officials charged with implementing the permitting scheme, 2) is overbroad, 3) imposes an excessively high permit fee, and 4) incorporates location restrictions that are unconstitutionally vague.

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'" *Virginia v. Black*, 538 U.S. 343, 358 (2003) (alteration in original).  It is well established that "[m]usic, as a form of expression and communication, is protected under the First Amendment."  *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee.").

The overbreadth doctrine permits facial attacks against a statute that restricts First Amendment expression and allows a court to invalidate such a statute if a "substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 1587 (2010) (citation omitted).  The doctrine reflects a relaxation of traditional rules of standing because of a judicial assumption that the "statute's very existence may cause others not before the court to refrain from constitutionally protected

speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 512 (1973).

However, overbreadth is "'strong medicine' that should be employed 'sparingly

and only as a last resort.'" *Neely v. McDaniel*, 677 F.3d 346, 350 (8th Cir. 2012)

(quoting *Broadrick*, 413 U.S. at 512).

Neither party contests that the ordinances at issue curtail speech in a

traditional public forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,

460 U.S. 37, 45 (1983) (noting that streets and parks have long been held in public

trust for use in disseminating ideas). The permit and fee requirements constitute

prior restraint on speech, and as such, there is a heavy presumption against their

validity. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)

(considering county assembly and parade ordinance). Even so, the government can

regulate its public spaces, provided that any restriction on the time, place, or

manner of speech "must not be based on the content of the message, must be

narrowly tailored to serve a significant governmental interest, and must leave open

ample alternatives for communication." *Id.* (citing *United States v. Grace*, 461

U.S. 171, 177 (1983)). Additionally, the government's scheme may not delegate

overly broad licensing discretion to a government official. *Id.* (citing *Freedman v.

Maryland*, 380 U.S. 51, 56 (1965)).

Plaintiffs contend that the city ordinance is facially invalid because it does

not prescribe adequate standards for the administrator to apply when he determines

whether to grant a permit.  Governmental regulations that allow arbitrary application are "inherently inconsistent" with valid time, place and manner regulations, because such discretion has the potential to suppress particular viewpoints.  *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981).  When evaluating a facial challenge, courts consider the city's "authoritative constructions of the ordinance, including its own implementation and interpretation of it."  *Forsyth*, 505 U.S. at 131 (citations omitted).

In *Forsyth* the Supreme Court struck down a county ordinance because it conditioned issuance of a permit on payment of a fee up to $1000 and gave a county official discretion to "adjust the amount to be paid" to cover administrative or public safety expenses.  The Court held that because the fee was essentially "left to the whim of the administrator" with no articulated standards, the ordinance violated the First Amendment.  *Id.* at 130.

On its face, the St. Louis street performance ordinance does not grant discretion to the administrator, but the evidence shows that in practice the administrator does exercise discretion in deciding whether to grant a permit.  Plaintiffs presented evidence that city employees have told performers that they must audition as part of their application.  The city denies that an audition is required, but it agrees that it may have told performers otherwise.  Witness

Raymond Moore, who plays saxophone and flute, testified that when he applied for a permit, he was told by a clerk to wait for Michael Hulsey[3] so he could audition. When Hulsey arrived, Moore played some of his music.  Hulsey said he was impressed, and Moore was then issued a permit.  Another witness testified that he was not required to audition but that Hulsey had approached him on the street when he was playing music without a permit; Hulsey had, therefore, heard him perform before he applied for the permit.  Hulsey testified that he requires applicants to meet with him and he sometimes asks them to "show" him what they proposed performing, by, for example, playing their music.  He has a guitar in his office, which can be used by guitarists who did not bring their instruments.  He has requested alterations to at least one applicant's proposal because he deemed it to be too dangerous.[4]

From the limited evidence presented at the preliminary injunction hearing, it appears that the enforcement of the ordinance changed substantially when Hulsey took over the permitting job in 2011.  Hulsey testified that before he took over the job, there was not much enforcement.  No auditions of any sort had been required before.  Hulsey testified that he was fairly "hands on" and that he spends a considerable amount of time during evenings and weekends visiting areas

---

[3] Hulsey is the Administrative Assistant to the Director of the Streets Department and is the *de facto* administrator of the scheme.

[4] Hulsey cited as an example a juggler who wanted to incorporate fire or chainsaws into his act; I assume Hulsey did not ask this person to perform with either when he applied for the permit.

frequented by street performers to see if any non-permitted people are performing. If he sees performers who lack permits, he tells them of the requirement and asks them to come to his office and apply.  Additionally, if there are complaints about excessive noise, late-night performances, or performers in prohibited areas, Hulsey will investigate.  On one occasion, he revoked a permit because the person had only one permit but had many people performing in a drum line late at night.

As stated above, the ordinance does not grant discretion to the administrator to deny the permit, but the evidence shows that in practice the administrator does exercise his discretion.  Yet the ordinance imposes no objective standards on Hulsey for determining the quality of or the risk posed by a performance, nor does it even require such an inquiry.  Based on the City's implementation and construction of the ordinance, plaintiffs have shown a likelihood of success on the merits of their overbreadth challenge for administrative discretion.

Plaintiffs have also shown likelihood of success on their claim that the permitting scheme is not narrowly tailored to serve a significant government interest.  The City asserts that the ordinance promotes its interests in maintaining public order and convenience, but it provided very little evidence on this issue.  As noted above, Hulsey testified about the drum line performing late at night with only one permit.  He testified that he received numerous complaints about this very

- 8 -

noisy incident from the public and from members of the Board of Aldermen.  The performers were not cited for any ordinance violations, but Hulsey later revoked the one permit that had been issued to the group's leader.

The ordinance requires any person who wishes to perform in the city's public spaces to first obtain a permit.  The ordinance limits the hours during which performances may occur, forbids the blocking of public passage and the obstruction of private property, mandates compliance with existing noise ordinances and bans amplification devices except for those using self-contained batteries, and requires a distance of fifty feet between each performer or performing group. The ordinance also states that police may disperse a portion of crowd that gathers and that blocks public passage.  Although the permit allows performers to accept contributions from passers-by, the City states that it only requires performers who actually accept contributions to obtain a permit and that those who do not accept money do not need a permit.[5]

I conclude that plaintiffs are likely to succeed in showing that the permit scheme is not narrowly tailored to the City's interests in maintaining public order and convenience.  The Court of Appeals for the Eighth Circuit has expressed doubt as to the nexus between the licensure of small groups and the governmental interest

---

[5] The court is not bound by the City's promises to only enforce the law against those who accept contributions.  *See U.S. v. Stevens*, 130 S. Ct. 1577, 1591 (2010).  In cases like this, where it is alleged that an overbroad law chills speech, it is especially important to adjudicate the constitutionality of the laws as written.

in managing public spaces.  *See, e.g.*, *Douglas v. Brownell*, 8 F.3d 1511, 1524 (8th Cir. 1996) (expressing concern about the application of a permit requirement to groups of ten persons); *cf. Bowman v. White*, 444 F.3d 967, 981 (2006) ("The University has a significant public safety interest in requiring a permit because of the time and resources necessary to accommodate the crowds that [plaintiff] attracts."); *Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009) ("[W]e and almost every other circuit . . . have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum.") (citations omitted).

Based on the limited evidence presented to me about the city's justifications for the statute, I conclude its interests in maintaining public order and convenience can be better served by measures less intrusive on First Amendment freedoms.  *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637, 100 S. Ct. 826, 836, 63 L. Ed. 2d 73 (1980) (ordinance banning solicitation in order to reduce trespassing and fraud was overbroad because those actions could be independently regulated).  The ordinance requires performers to obey existing noise ordinances, but they would be bound by those and other more generally applicable laws even if this permit requirement did not exist.  In the drum line incident discussed in the evidence, the City could have used the existing noise ordinance to cite the performers.  The portions of the ordinance that address hours of operation, crowds,

and volume could be imposed independently of the permit requirement.[6]   Further,

the City's decision to only apply its permitting requirement to those collecting

money undermines its arguments as to the necessity of the scheme.   There is no

reason to believe that a street performer playing *gratis* is any less likely to block

thoroughfares, create crowds, act with hostility, or engage in territorial disputes

than a performer accepting contributions.   *See Berger*, 569 F.3d at 1041–42.[7]

       At the hearing, the City argued that because the ordinance is only enforced

against individuals who seek monetary contributions, it does not violate the First

Amendment.   But the fact that plaintiffs seek donations for their performances does

not alter the status of their artistic expression; protection under the First

Amendment is not lost if the speech is "sold rather than given away."   *City of*

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 n.5 (1988); *see also Vill. of*

*Schaumburg*, 444 U.S. at 633 ("Our cases long have protected speech even though

it is in the form of . . . a solicitation to pay or contribute money.") (alteration in

---

[6] § 20.55.060.A–D.

[7] This is not to say that no permitting scheme could be considered a valid time, place, or manner regulation.  For example, in *Bowman v. White*, the Eighth Circuit rejected a street preacher's as-applied challenge to a university's requirement that non-collegiate entities obtain a permit in advance before using outdoor space.  444 F.3d 967, 981 (8th Cir. 2006).  The court found the university's policy was narrowly tailored to its interest in public safety, given that the preacher anticipated crowds of over 50 and he had actually drawn crowds of over 200 students and inspired violent outbursts.  *Id.*  Similarly, the Ninth Circuit in *Grossman v. City of Portland* contrasted an unconstitutional permitting scheme with a more narrowly tailored one that applied "only when City services are required because the event interferes with normal vehicular or pedestrian traffic."  33 F.3d 1200, 1207 (internal quotation and citation omitted); *see also id.* at 1207 n.13 (listing ordinances in other cities that the court viewed as more narrowly tailored than the ordinance under scrutiny).

- 11 -

original) (citing *Bates*, 433 U.S. at 363)); *Smith v. California*, 361 U.S. 147, 150

(1959) ("It is of course no matter that the dissemination [of books] takes place

under commercial auspices."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501

(1952) (affording protection to motion pictures even where sold for profit);

*Jamison v. Texas*, 318 U.S. 413, 417 (1943) (overturning law prohibiting handbills

advertising books and soliciting contributions).

 Even if I applied the less stringent review of schemes regulating commercial

speech, this ordinance is still overbroad.  Commercial speech is expression that is

related solely to the economic interests of the speaker and its audience.  *Cent.*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561

(1980).  Commercial speech is not entitled to the same level of constitutional

protection provided to noncommercial speech.  Rather, courts are to engage in

"intermediate scrutiny" of restrictions on commercial speech, using the line of

inquiry set forth in *Hudson Gas*:

> [f]or commercial speech to come within [the First Amendment], it at
> least must concern lawful activity and not be misleading.  Next, we
> ask whether the asserted governmental interest is substantial.  If both
> inquiries yield positive answers, we must determine whether the
> regulation directly advances the governmental interest asserted, and
> whether it is not more extensive than is necessary to serve that
> interest.

*Id.* at 566.  Even if this standard might apply, plaintiffs would be likely to succeed on the merits because the ordinance is likely more extensive than necessary to serve the government's interest in maintaining public order and convenience.

Having concluded that plaintiffs are likely to succeed in their overbreadth claims, I need not reach their remaining arguments at this time.[8]

B.      Remaining *Dataphase* Factors

Because the plaintiffs are likely to succeed on the merits of their overbreadth claim, the remaining *Dataphase* factors are generally deemed to be satisfied. *Swanson*, 692 F.3d at 870.  Nonetheless, I conclude that the remaining *Dataphase* factors weigh in favor of a preliminary injunction.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).  The City continues to prevent the enjoyment of First Amendment rights and thereby deals irreparable harm to plaintiffs.  The equities and public interest are likewise in favor of an injunction.  The City will suffer no harm, as it already exempts from its permitting scheme street performers who do not solicit contributions, and the City argued at

---

[8] The city presented evidence supporting its argument that the $100 fee was reasonable based on paying Michael Hulsey overtime for his evening and weekend work in enforcing the ordinance. From the evidence that was presented, however, one might conclude that Hulsey spent this amount of time because of his interest in music, rather than because it was necessary to protect legitimate city interests.  I need not, and do not, decide the reasonableness of the fee at this time.

the hearing that it already had issued permits for this year to the majority of those who desired them.  Any street performer will remain bound to follow the same noise and public safety ordinances that are generally applicable to the population. I will, therefore, grant plaintiffs' motion and issue a preliminary injunction.

Pursuant to Rule 65(c), the court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to be wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The City was unable to articulate any harm that might occur if I were to issue a temporary injunction.  I find that a bond of a nominal amount would provide adequate security.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion to issue a preliminary injunction [# 3] is granted, and that plaintiffs shall be required to pay a bond of $10.00 in support thereof.  A separate injunction shall issue in accordance with this memorandum.

**IT IS FURTHER ORDERED** that the preliminary injunction [# 17] entered previously on May 28, 2013, is vacated.

**IT IS FURTHER ORDERED** that this case is referred to mediation, effective immediately.  As set forth in the order referring the case to mediation

entered separately, the mediation shall be completed by September 30, 2013.  If the

case is not resolved in mediation, it will be set on an expedited trial schedule.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this30th day of July, 2013.